v. Sherry Travis and others, and Vic Septic and others. Arguments not to proceed. 15 minutes for plaintiffs and 15 minutes to be shared by defendants. Ms. Schuster for the appellants. Good morning, and I would, in fact, like to save at least five minutes for rebuttal. Very well. Thank you. Your Honor, the theme, the basis, and the cause of this case is recklessness. Reckless policy that created a warrant when there was no probable cause, a reckless operation of the policy. What is it about the policy as articulated that makes it reckless? There was a, you know, that seemed like a defined procedure, which, if followed, seemed reasonable. What is it about it that makes it reckless? The policy was reckless because it depended on only one thing. The office, the probation office, was asking for warrants without doing any investigation. The policy for probationers, if they missed an appointment or if they didn't show up or if they were alleged to have violated their probation, was to call them, to have them come in, to give them three chances, and there was a four-page procedure for what to do for probationers. People who were assigned to community service without being put on probation, because it was a less serious offense and they didn't need supervision, were subject only to this perfunctory idea, which was a policy operated since at least 2007, that the orders would be put in Mr. Bayh's file and Mr. Bayh would, from time to time, we don't know, periodically, but we don't know how often or in what order, he would check the file. He'd look in the file and if there was any order in the file to community service and the date had passed for the order, he would put that person on the arrest list. Wait a minute, then he looked in his book and he looked on a list? He submitted an affidavit in which he said that what he did was look in his file and he saw the order there and, therefore, he put him on the list. It was later, at deposition, that he added that he looked in his computer. But he was the one, the only thing in the office that he didn't do was the sign-in sheet. Everybody who came into the office signed the sign-in sheet. I think it's more than reckless to not check the sign-in sheet and to not have as part of the policy, you will check the sign-in sheet. Do you have any idea how the paperwork got into the book? Nobody seems to know. As you know, Chief Probation Officer Travis, you mean how it was supposed to get into the book, into the file? I may not understand it correctly, but I was under the impression that it goes in the slot, it sits there, and then the people come in and Travis takes it and she makes a bundle and she gives it back to Bize and then Bize takes it and he puts it in a loose-leaf folder and then also makes a spreadsheet and that's what's supposed to happen. Some of this may be incorrect, and then when he went and he saw that it was still in the file, the order was still there in the envelope, I thought he checked the book, it wasn't there, and so he signed the warrant, but that somehow later it all showed up in the book. We don't know how that happened, and we don't know that later it showed up in the book. All we know is that when the court, after the four days that Mr. Lewis was in jail, when the judge said, check this out, did he appear or not? At that point, Bize went off and he came back to the court and he said, yes, he did appear. We don't know for sure if he checked the sign-in sheet or if the name did appear in his book at that time. That's what's wrong with this system. It had no double check, nobody checked on anything, the orders were picked up by whatever probation officer went over to the clerk's office, they were brought back, they were supposed to be put into Mr. Bize's file, his mailbox, they were then supposed to be put by Mr. Bize into Mr. Bize's file for pending orders, orders pending the arrival of the person ordered. Then when the person ordered came in, whomever they spoke to was supposed to take the order out of the file and either give it to Mr. Bize or put it into this three-ring binder which held the orders that were active, people had come in. That was the system. The way the system operated, if the order didn't come in in time, or if the person who picked up the orders didn't pick up that order, or if somehow the order didn't get into the file, or . . . Counsel, first of all, you have the issue of qualified immunity. The testimony is that nothing like this ever happened before. It's hard to say that the individuals couldn't rely on this, but separate and apart from that, before we had computers, that's the way people did everything in the courts. Excellent point, but the thing is they had checks on things. If the procedure was going to lead to somebody being arrested, if it was going to lead inevitably to somebody being arrested, and don't forget the rest of this procedure was to simply, if the order was still in the file after the date, the procedure didn't require checking anything else. The person's name would be put on a list. The list, without being sworn to or without having any reason how the list came to be, would be given to the court and somehow turned into a warrant. The person was sure to be arrested. They were causing people to be arrested based on this little system. What you're saying sounds more like a Manel problem than an individual officer problem because, do you have any indication that any particular officer was acting recklessly in terms of following the policy? Sure. I have to say that although defendants want to say that neither Byne nor Travis knew of any previous happening, that wasn't what they testified to. They each said in their affidavits, I don't have any recollection of this happening before, which is quite different from being willing to testify that it never happened before. Well, do you have any indication that it happened before? We don't, but who knows because it's not the kind of thing that would really come to the court. It was sure to result eventually in somebody being wrongly arrested because there were no checks. I mean, a simple check of the sign-in sheet would have revealed whether somebody came in. Why not do that? Well, does basic negligence give rise to this constitutional violation that you're asserting? Well, a constitutional violation is an arrest, an imprisonment without probable cause, and we know that happened and we know that everybody knows that's a violation. If you had a facially valid warrant, does that really constitute probable cause for a wrongful arrest? I mean, we know that in the final analysis, the people should not have been arrested because the basis wasn't there, but there was this facially valid warrant issued. And I know you're saying that the procedure that resulted in that was defective because you didn't have checks and balances, but where do we get to this? How do you justify the constitutional violation there? Because the warrant was not facially valid. If you look at the warrant, you will see, first of all, that it is a warrant for failure of community service. That is not something that could possibly happen in front of the court. It therefore could not have been direct contempt. It therefore could not result without probable cause, an affidavit of probable cause or probable cause written by a sworn statement on the warrant because it could not have been in front of the court.  The warrant was not valid on its face. Well, what did the warrant look like? The warrant, it's a piece of paper, it's a form like all warrants are, and it says that the person, I brought one with me actually, it says four and then it gives the underlying offense over here and then over here it says failure of community service, and then it says sworn to, but nobody swore to it, and that's it. That's the warrant. It's signed by the clerk, right? It's signed by the clerk. In Ohio, the clerk can sign bench warrants? The clerk can sign a bench warrant, Your Honor, but this is not a bench warrant for direct contempt. This is a warrant for indirect contempt. We're talking about whether the form of the warrant is facially, whether it looks facially valid, I guess. It does not look facially valid, Your Honor, because it says sworn to before me and nobody swore to anything, so there is a big piece missing, and even though nobody swore, it's signed by the clerk. You're out of time. You can use your five minutes rebuttal if you wish now, or you can save it. I'm going to save it. Well, Your Honor, I do want to mention the Eleventh Amendment, but I'll save my five minutes. Okay. Very well. Thank you. Have the defendants agreed to share their time? Yes, Your Honor. I will be taking ten minutes of the time, the remainder, to counsel for the City of Euclid defendants. Very well. I'll take the remainder. May it please the Court, my name is Frank Skeldone. I represent the bailiff, Robert Nolan, and probation officers, Steven By and Sherry Travis. This case arises simply from a mistake made by someone in the probation department in processing the paperwork that has to do with the court-ordered community service. This case fits firmly within the qualified immunity protections, and that's the focus of my argument here today. Qualified immunity insulates public officials from liability for discretionary conduct that does not violate clearly established rights. There are some ground rules that go along with qualified immunity. The plaintiff has the burden to demonstrate a violation of clearly established rights, and officials are immune unless the law clearly prescribes, beyond debate, that the actions they took are unconstitutional. People have a right not to be arrested without probable cause to think that they did what they supposedly did, right? And if you go to your community service, you shouldn't be arrested for not going. So I guess then you have to look at, well, was there probable cause to believe that they didn't go? And what he did was simply look in a book, and it wasn't a book that said, these are the people who went to community service. It was... First of all, is it clear that he did look in the book? I don't believe there's any dispute. Okay. Because plaintiff's counsel seemed to indicate it wasn't clear that he looked in the book at that point, that he just saw the envelope and... He looked in the folder, and the order was there. Okay. It indicates that he didn't commit, that these, that both plaintiffs... Okay, so you agree all he did was see the order. He didn't then go someplace to double check? I'm not sure about that on the record, but yeah, I don't believe that that's the case. Okay. So, I mean, if the question is whether people showed up to do their service, the fact that an order is still sitting there is, it may be a reason why you should check further. Certainly if it's still sitting there, go, hmm, did these people come in? I don't know. Let me go see. And then you make a few inquiries and find out whether you should be submitting a warrant request to the judge. In the history of this system, there's never been another incident like this that's in this record, or to my knowledge. What we have here is a simple mistake, and the weakness of plaintiff's case is to defeat a claim of qualified immunity, the plaintiff must establish the defendant's acted knowingly or intentionally to violate his or her constitutional rights as mere negligence or recklessness is insufficient, and that's the Ehlers versus Scheibel case, 188. She argues today that recklessness is sufficient. This case... That's how she started out. Yeah. And this is a case of recklessness. I said, I don't think that's the law, but... And I don't believe that it is either. In that case, the Ehlers versus Scheibel case, 188, F3rd, 365, a Sixth Circuit case, 1999, provides that. And the Supreme Court, the United States Supreme Court, has declared that qualified immunity protects all, quote, all but the plainly incompetent or those who knowingly violate the law. And that's Malley versus Briggs. So what the plaintiffs, or what the defendants did here, none of it goes beyond negligence, even under the most gracious allegations or taking of the allegations of the plaintiff. What happened? What is the explanation for what happened? Eventually these things got in the book, right? Do we know that or not? That I don't know, but ultimately when they came before the court, it was determined that they were in the process of doing their community service and the judge found as much. And it happened with one after they spent four days in jail and the other one after they spent five and lost the job and some other things, is that correct? I believe that's the allegations of it and the... All right. So if we... You've cited the case law and it seems accurate, but while this doesn't bear directly on this point, you indicated that this is the first and only time that this has happened. And Judge White just asked, how did it happen? What has been done, if anything, to make sure that something like this doesn't happen again? Because a deprivation, a wrongful deprivation of liberty by arrest is problematic and troubling and maybe the city of Euclid answers that, but what's been done? I'm not sure what's been done. Okay. I'll ask other counselors. Fair enough. I mean, I don't think it's exactly known. I mean, the testimony and what exactly happened, whether Travis forgot to move the orders into the three ring binder that would indicate that community service was being done or that they were placed before... I thought that Bize does that, not Travis. I believe that it's Travis. But I may be... That's what I have in my notes here. But in any event, it's not clear what happened causing the mistake, but what we do know that it is a mistake. And the conduct of Sherry Travis was merely explaining to the plaintiffs how much time they had to complete community service and where to report. But this is just an unfortunate wrong where there is no remedy in your view. That's correct. And I mean, it's not unlike many issues of immunity that we have in state and federal courts. How does the pregnant woman end up staying there a whole other day once the judge knows what happened? I'm not sure on the timing or why that would be the case. It's like nobody cared. I mean, it's like all of this indifference, like, sorry, you know, didn't, I don't know. I don't think, I mean, as far as the history of this never occurring, it doesn't seem to manifest itself in the interactions with other of these community service issues. We're not seeing this. It's not a problem that's going on and on and on where people are being allegedly deprived of their constitutional rights. And I think that also goes to the Monell claim that was suggested. I mean, without a single instance does not provide a basis for a Monell claim as well. Can you see that it's a terrible system? I mean, a system that seeks to determine whether somebody did what they were supposed to do based on their order for community service. A system that tries to determine that shouldn't be based on whether a paper has been filed. That's an alert. That tells you, you have to look into this and then you find out whether they've reported. You don't say there's a paper there. That means they didn't report. Are you following what I'm saying? I believe so. Again, you know, it's unfortunate this occurred, but this isn't a pervasive issue. Really it boils down to a mistake that was made. The system was. The system what? The system under this record appears to have been working fine. Mistakes were not being made. There wasn't a, does not appear to be a situation where there is a nobody cares. The paperwork had been being processed seemingly properly. Nobody was falling into this. Okay, but if you're going to enact a system like that and establish a system like that that relies on the presence of a piece of paper that has nothing to do, what you're saying is, look, we have established a system and because our system is so good, we know that if a piece of paper is sitting there, it means that they violated the court's order. And if you're going to say that and act on it, then it seems to me that you, that you ought to be able to support that, that the reason we know that is because the paper doesn't get there unless these four things happen. But it's not like that. I mean, it's, you file this, you do this, you're not even sure whose job it is, it's   really, it's a flag. That's all it is. It's not a reason to believe that the person didn't report. And then you go out and put a warrant on it and go, well, we're relying on our system. Again, my answer to it is that there is a system and there's a system for where the paperwork goes. It's put in the mailbox. It's put into this folder where the orders are. It's checked periodically. Is there a system for finding out whether somebody has reported? That is the system. That it's, if that order is not in there, if the order remains in there, then they haven't reported for community service. We know that's not true. You can't rely on that because here these people had done everything they were supposed to do and they still were wrongfully arrested because the system said they hadn't done it when in fact they had. They had done what they were supposed to do and the system resulted in them being arrested, held in jail, and all of the other negative consequences that flowed there from. So it may have only happened one time, but this is prima facie evidence that your system, at least in this instance, did not work and yielded terrible, terrible consequences for these people. It did for an unfortunate situation, but it does not demonstrate that any of the individual defendants are not entitled to qualified immunity. There was no intentional violation of constitutional rights and it doesn't, respectfully, it doesn't establish a Monell claim under these facts. I want to know from the city, how are they going to assure this court that this never happened? Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the court, I am Kelly Sweeney. I represent Renee McIntyre, Victor Steppak, and the city of Euclid. With respect to Defendant Steppak and McIntyre, they were individuals who were jail corrections officers. They were presented with the two appellants with arrest warrants, and we do believe they were facially valid. They're in the record at page ID 96 and 113, and I do have copies for the court, if I may approach, if you would like to take a look, per our claim that they were facially valid. Is there a complaint that, a complainant that signs? Well, the judge signs, and this is located in the record at page ID 92 and 109. Mr. By would present himself to the court to say these individuals didn't perform or didn't show up to sign up for community work service, and this is the judge's file jacket. Why don't you show them to plaintiff's counsel. Is there any objection for us reviewing these documents? Your Honor, I think they're in the record. I know, she just, I think she wants to do it for emphasis, but. And your Honor, she did ask about the warrants, so that's the only reason I'm. Alright, if they're in the record, is there any objection if they're in the record then? No. Okay, just hand them to the court officer, he'll give them to us at conference. Unless there's, is there something right now that you want us to look at? No, Your Honor, we're just asking about the warrants, and you know, the question that they're not facially valid because the judge didn't sign off on them. So Mr. By would present himself to the court and get the warrant approved by Judge LeBaron. And what would he say? He'd give her a list that these particular individuals didn't show up to sign up for community work service. And, okay, did he, and his sole basis for saying it was that there was a piece of paper in the file? In this particular case, yes. Yes. But getting back to my two particular defendants. You said in this particular case, does that mean that he would do something different in another case? Well, that's just for community work service. Yeah, the court's very busy, as this court I'm sure is well aware. So not only do they have to supervise probationers, they have about 500 a year, I would say, on probation. They do drug testing and things like that. What I'm focusing on is the situation dealing with community work service. You said he would say to the court that the person didn't show up in this particular case. I'm saying in other community work service cases, are you saying that he would follow a different procedure? No, he would generally give the court a list. Like, Your Honor, these are the folks that haven't showed up for community work service. And there'd be a list, and the judge would sign off on each of the file jackets that the warrant would be issued. And then she'd turn that in over to her clerks, and they would do the docket entries and do the warrants. So with respect to McIntyre and Stepick, who were the jail corrections officers, the defendant's appellants did show up at the jail after their arrest and were presented with those two warrants. So I believe they're entitled to qualified immunity, and I would ask this court to agree with Judge Nugent. And I'm really looking at the case of Baker v. McCollin, which is 443 U.S. 137. In the Baker case, an unlawful brother got a driver's license with the good brother's name on it and the unlawful brother's photo. So he had a drug case and things like that, and he got a warrant out for his arrest, but it was in the good brother's name. So good brother was arrested, and it was a similar situation where he was arrested over a holiday weekend, December 30th through January 2nd. And it wasn't until January 2nd that the detaining sheriff saw the driver's license and says, oh my gosh, mistaken identity. We have the wrong brother in here. Despite repeated protests by the good brother, it's not me. You're looking for my brother. So in that case, the U.S. Supreme Court held, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence where the claim is based on mistaken identity or a defense such as lack of requisite intent. And I think we should have the same result here with respect to McIntyre and Stepick. While plaintiffs objected to their arrest because they stated that they were doing their community work service, McIntyre and Stepick could not have released those folks at that time. Court was closed for the weekend. It was Good Friday. It was Easter weekend. On the very next day that court was open, they did see Mr. Lewis, and females are housed at a different facility. That's why we couldn't get Ms. Beckham in until the following day. So as soon as they were both able to be seen by the judge, she did release them. And with respect to the city of Euclid, we were talking about the Monell claim. And as Mr. Scaldone said, this has been a single incident in over the 20 years that 18 years that Ms. Travis has been the chief probation officer at the city of Euclid. And we do have a high volume court, and it was a terrible mistake. I don't think anybody is happy this occurred. And your Honor said that we don't have remorse for this. But we really do. It's terrible. But I just don't think it rises to the level of constitutional violation. Are you still using the same system? They do use the same system. I don't know exactly what they're doing. But I can't say, and please, I don't want this to sound callous, but it was one mistake over many, many years with thousands of folks that come through the doors there. So I don't know if a change is necessarily necessary because of one mistake. Maybe are they triple-checking instead of double-checking the orders that come through? But somebody just mistakenly didn't pull the piece of papers from one binder and put it in another. Any further questions? Thank you. Rebuttal. Thank you. To answer a few questions, as nearly as we can tell from the affidavits and from the testimony at deposition, the system was that somehow the orders would get into this file folder. When a person who was ordered to community service but was not on probation, was just not going to be supervised by a probation officer, but was just going to do community service, when such a person came to the court to sign up, to the probation office to sign up, the probation officer who took their sign-up, which in this case was Travis, was supposed to go to this file folder, get out the court order, do whatever they did to sign the person up, and then put the court order in a binder for people who had signed up, or give it to Mr. Vi, whichever happened first. In this case, Ms. Travis was unable to say whether the order was in the file folder when she went to get it. She wasn't sure whether it was or not. She surmised that it wasn't, and surmised that it must have come in late, and somehow gotten into the file folder after they had already signed up. That's what happened. It's that perfunctory. And the reason that this is a constitutional violation... But, okay, what was it that still remained in the folder? The rest of the orders for people who had come in, who had not come in, and had been ordered to come in, since the last time, whenever it was, that Mr. Vi checked. So he would check once a month, once a week, he wasn't exactly sure. But he would check this file folder. So it was Travis that was supposed to have retrieved the order from that file folder and put it with the rest of the paperwork? Yes, it was. Because she was the person who interviewed the two plaintiffs. I want to get a little bit to the fact that, yes, they were reckless. And I saw you go, whoops. They were so reckless that it was a total abuse of discretion. And I think the court knows that an abuse of discretion is a violation, and it is not subject to qualified immunity. When an officer abuses his discretion, for instance, as to the amount of force he uses, he does not have qualified immunity from using that amount of force. What's the discretion? The discretion here was how they were going to ensure that this system worked. They had discretion to check the sign-in sheet. They had discretion to make a better system. They were satisfied with this system. And the problem with the system was that eventually it was going to fail. Eventually exactly what happened was going to happen. When Mr. Bayh would check the file folder, he would make a list of all the orders that were still in the file folder for people who had been ordered to community service. He would put those names on a list, and the list simply said, warrants requested. It didn't say why, and it wasn't sworn. It was just a list of names. The system, as I said, for probationers was entirely different, and there is some evidence that this system was changed after this event, but I'm not sure if it was. I would like to mention a little bit Mr. Nolan and why Mr. Nolan also is in this. When he served this warrant, he could see, because he had been a police officer in Euclid for many, many years, and he was still working in his old police officer station as a police officer, but he was part-time. He was semi-retired. When he picked the two plaintiffs up, when he picked up Cashay Beckham and Marcus Lewis, they had with them their paperwork from community service, and the paperwork that Ms. Beckham had with her had handwriting on the bottom, and the handwriting said Goodwill Eastlake. It gave the address on Vine Street. It gave the contact person a phone number. It said start date March 27, Monday, Wednesday, and Thursday. This was the first Thursday after March 27, and they had been arrested on Vine Street, which is the street that goes directly from Goodwill to where their children were. He could not be bothered to look. The case law says that if you have a warrant, you don't have to. He had a warrant that was strange-looking, and I think everybody has to admit I spent 12 years as a prosecutor. I never saw a warrant that looked like that. He had a warrant that looked enough strange that did not have an affidavit, did not have any sworn statement on it. What was he supposed to do? He could have used his discretion, and he could have looked at their papers. He could have called Goodwill and said, By the way, are these people telling the truth? Goodwill would have said yes. They submitted an affidavit saying that they were open until 8 o'clock that night, and these people would not have been incarcerated wrongfully, the pregnant woman for five days over Easter. Can you imagine with her kids at daycare wondering what was going to happen? We're out of time. Any other questions? I'm sorry. Any further questions? All right. Thank you very much. May call the next case.